UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CENTURY PACIFIC, INC., and BECKER
ENTERPRISES, INC.,

                        Plaintiffs,

        -v-                                                    Case No. 03-CV-8258 (KMK)

HILTON HOTELS CORP., DOUBLETREE CORP.,        OPINION AND ORDER
and RED LION HOTELS, INC.,

                        Defendants.

Appearances:

Dwight J. Davis, Esq.
Courtland Reichman, Esq.
King & Spalding, LLP
Atlanta, GA
*Counsel for Plaintiffs*

Jonathan Solish, Esq.
Glenn J. Plattner, Esq.
Bryan Cave, LLP
Los Angeles, CA
*Counsel for Defendants*

Lee W. Stremba, Esq.
Troutman Sanders, LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiffs Century Pacific, Inc. ("Century"), and Becker Enterprises, Inc. ("Becker"), are

hotel operators that entered into agreements in early 2001 with Defendants Hilton Hotels Corp.

("Hilton"), Doubletree Corp. ("Doubletree"), and Red Lion Hotels, Inc. ("Red Lion"), to convert

hotels owned by Plaintiffs in Colorado into Red Lion hotel franchises. The pending causes of

action from Plaintiffs' First Amended Complaint are for: (1) common law fraud; (2) negligent misrepresentation; and (3) fraudulent misrepresentation.  In addition, Plaintiffs have purported to state "Reply Counterclaims" asserting an additional cause of action against Red Lion alleging breach of the Franchise Agreement ("Agreement") and of the implied covenant of good faith and fair dealing.  Defendants moved for summary judgment on all claims and to strike portions of the evidence submitted by Plaintiffs in opposition to summary judgment.  For the reasons stated herein, Defendants' Motion to Strike Evidence is granted in part and denied in part and Defendants' Motion for Summary Judgment is granted in its entirety.

<u>I.  Background</u>

<u>A.  Factual History</u>

<u>1.  Red Lion's Pre-Franchise History</u>

Defendant Doubletree purchased Defendant Red Lion in 1996.  (Defs.' Statement Pursuant to Local Rule 56.1 ¶ 10 ("Defs.' 56.1"); Pls.' Resp. to Defs.' Statement Pursuant to Local Civil Rule 56.1 ¶ 10 ("Pls.' 56.1").)  At the time, Red Lion was a fifty-six hotel chain, with most of its properties in the Pacific Northwest.  (Defs.' 56.1 ¶ 11.)  In 1997, Doubletree merged with Promus Hotel Corporation ("Promus"), which owned the Embassy Suites, Hampton Inn, and Homewood Suites hotel brands.  (*Id.* ¶ 12; Pls.' 56.1 ¶ 12.)  By the end of 1997, Promus had converted all but sixteen Red Lion hotels to the Doubletree hotel brand, and had no specific plans to grow Red Lion.  (Defs.' 56.1 ¶¶ 13.)

Following management changes in early 1999, new CEO Norm Blake asked James R. Dina ("Dina"), chief operating officer for Red Lion, to develop a plan for the Red Lion brand.

(*Id.* ¶ 15; Deposition of James R. Dina 29 ("Dina Dep.")[1].)  Dina responded with a proposal to "revitalize" the Red Lion brand, including by franchising the brand and creating a guest loyalty program dubbed the Red Lion Club.  (Defs.' 56.1 ¶ 16.)  In October 1999, Promus relaunched the Red Lion brand with a campaign entitled "We're back," that included a new advertising strategy and conversion of approximately "six or seven" hotels into the Red Lion brand.  (*Id.* ¶ 16; Dina Dep. 86.)

### 2.  Red Lion's Franchise Plan

Red Lion changed ownership again as part of a merger between Promus and Defendant Hilton that was announced in early September 1999 and consummated on November 30, 1999.  (Defs.' 56.1 ¶¶ 17, 19; Pls.' 56.1 ¶ 17, 19.)  Hilton's documents from the transaction show that, during this period, the company considered "discontinu[ing]" or "eliminat[ing]" the Red Lion brand as part of the merger.  (Pls.' 56.1 ¶ 20; Affirmation of Douglas L. Friedman in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Friedman Aff.") Exs. 50-61.)  Dina, who initially remained chief operating officer of Red Lion for Hilton, left the company only about thirty days following the merger.  (Defs.' 56.1 ¶¶ 20; Pls.' 56.1 ¶ 20; Dina Dep. 11-12.).

Hilton appointed Tom Murray ("Murray") to succeed Dina as the executive in charge of

---

[1] The Parties attached portions of Dina's deposition to various papers, including Defendants' Notice of Motion (Ex. 10) and Plaintiffs' Affirmation of Douglas L. Friedman in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Ex. 6).  The Court will simply refer to evidence drawn from these exhibits as the "Dina Dep."  In addition, some portions of the Dina Deposition, as well as numerous other exhibits discussed in this Opinion, were submitted under seal.  However, the portions of these exhibits discussed in this Opinion were mentioned in the parties' briefs or their Rule 56.1 statements and are thus part of the public record.

Red Lion.  (Defs.' 56.1 ¶ 21; Pls.' 56.1 ¶ 21.)  Dieter Huckestein ("Huckestein"), Hilton

executive vice president and president of hotel operations, instructed Murray in early 2000 to

make an assessment of the Red Lion line of business and to report back to Huckestein with a

five-year plan.  (*Id*.; Defs.' Notice of Motion Ex. 11 at 11, 13 ("Huckestein Dep.").)  Murray

reported his plan in June 2000, calling for an aggressive expansion of the Red Lion brand, and

Hilton approved it and directed him to implement it.  (Defs.' 56.1 ¶ 21, 26; Pls.' 56.1 ¶ 21, 26.)

Among other things, the Murray plan called for Red Lion to develop its own guest loyalty plan,

and so the chain continued to use the Red Lion Club and did not join "Hilton Honors," the

company's larger guest loyalty program.  (Defs.' 56.1 ¶ 24; Pls.' 56.1 ¶ 24.)  This made Red

Lion the only brand in the Hilton family of hotel chains that did not participate in the Hilton

Honors program.  (Huckestein Dep. 29.)

### 3.  The Parties' Franchise Negotiations

Plaintiff Century began discussions with Red Lion in August 2000 to convert a Colorado

Springs, Colorado, hotel property it had owned since 1990 into a Red Lion franchise.  (Defs.'

56.1 ¶¶ 27-28; Pls.' 56.1 ¶¶ 27-28.)  Century's president, Kenneth R. Riley ("Riley"), had been

in the hotel business since the 1960s and had built, owned, and/or operated hotels in at least nine

other cities prior to the Red Lion Franchise Agreement.  (Defs.' 56.1 ¶¶ 2-3; Pls.' 56.1 ¶¶ 2-3;

Friedman Aff. Ex. 12 at 7-17 ("Riley Dep.").)  Riley was an experienced hotel franchisee, having

owned properties in the Best Western and Travelodge franchise systems during the 1990s.

(Defs.' 56.1 ¶ 4; Pls.' 56.1 ¶ 4.)  Century was represented by counsel during the negotiations.

(Defs.' 56.1 ¶ 29; Pls.' 56.1 ¶ 29.)

During the course of negotiations and before the Agreement had been signed, Riley and

Al Teles, a Century manager, became concerned about a provision in the proposed agreement that would give Hilton a right to sell Red Lion. (Defs.' 56.1 ¶ 33-34; Pls.' 56.1 ¶ 33-34.) According to Century, Riley and Teles were given oral assurances by Red Lion's representatives that Hilton would not sell the Red Lion brand. (Pls.' 56.1 ¶¶ 32-35.) Not content merely to rest on these representations, in January 2001, Century negotiated a contract provision (the "Three-Year Window"), Paragraph 14(f), providing Century with termination rights on its franchise agreement at any time between the third and fifth anniversaries in the event that Hilton "no longer owns, manages, controls or franchises the Red Lion brand. . . ." (Defs.' 56.1 ¶¶ 35-36; Pls.' 56.1 ¶¶ 35-36.) Even with the addition of the Three-Year Window clause, however, Hilton expressly retained the right to sell Red Lion in the final Agreement. (Defs.' 56.1 ¶ 37; Pls.' 56.1 ¶ 37; Friedman Aff. Ex. 45 at 11.) The Century Agreement with Red Lion was signed on April 20, 2001, although the Agreement was backdated to February 13, 2001, and the Century hotel opened for business as a Red Lion on June 25, 2001. (Defs.' 56.1 ¶ 38.)

Plaintiff Becker began negotiations in the fall of 2000 to convert a hotel it owned in Pagosa Springs, Colorado, into a Red Lion franchise. (Defs.' 56.1 ¶ 39; Pls.' 56.1 ¶ 39.) Becker's President, Donald Becker, was experienced in the business as a licensed contractor who had constructed approximately twenty-one hotels, including the construction and renovation of at least one Red Lion property. (Defs.' 56.1 ¶¶ 6-99; Pls.' 56.1 ¶¶ 6-9.) Though Donald Becker was aware of Hilton's right to sell Red Lion under the Agreement (Defs.' 56.1 ¶¶ 44; Pls.' 56.1 ¶ 44), Becker did not protest the right-to-sell provision, and did not negotiate for a Three-Year Window provision in its franchise agreement as had Century. The Becker franchise agreement was executed by its parties during March 2001. (Defs.' 56.1 ¶¶ 45; Pls.' 56.1 ¶ 45.)

5

4.  Hilton's Sale of Red Lion

In March 2001, a Texas-based business consultant approached Hilton suggesting a deal between Red Lion and the Rotch Group, owner of a chain of "Red Lion" pubs in England. (Defs.' 56.1 ¶ 50; Pls.' 56.1 ¶ 50.)  Hilton and Rotch executives met on March 14, 2001, and Hilton provided Rotch with information about Red Lion and certain Doubletree properties. (Defs.' 56.1 ¶¶ 50-51; Pls.' 56.1 ¶¶ 50-51.)  Hilton asked Rotch to provide an estimated valuation for those assets before Hilton invested further resources in a possible transaction.  (*Id.*) On May 7, 2001, Rotch responded with a $70 million estimated valuation. (Defs.' 56.1 ¶¶ 52; Pls.' 56.1 ¶¶ 52.)  Because Hilton internally valued the same assets as worth more than $150 million, it terminated the discussion and had no further contact with Rotch.  (Defs.' 56.1 ¶¶ 53; Pls.' 56.1 ¶¶ 53.)

Meanwhile, also in March 2001, Lehman Brothers ("Lehman") had approached Hilton and suggested that Hilton expand the Red Lion brand by purchasing WestCoast Hotels, a company based in Spokane, Washington, that owned a smaller chain of hotels.  (Defs.' 56.1 ¶¶ 55; Pls.' 56.1 ¶¶ 55.)  Hilton indicated to Lehman that it was not interested.  (Defs.' 56.1 ¶¶ 57; Pls.' 56.1 ¶¶ 57.)  Lehman next suggested to WestCoast that WestCoast buy Red Lion from Hilton, and, on June 7, 2001, Lehman first contacted Hilton regarding a possible sale of Red Lion.  (Defs.' 56.1 ¶¶ 59-60.)

By this time, Plaintiffs had signed their franchise agreements.  Neither Plaintiff, however, had yet reopened its hotel as a Red Lion because each was in the process of modification and renovation in anticipation of opening.  (Pls.' 56.1 (additional facts) ¶¶ 33-34.)  Hilton, meanwhile, was upgrading fire safety systems at all of the previously Promus-owned hotels, a

6

project that was estimated to cost $24 million.  (Defs.' 56.1 ¶ 63.)  The Becker hotel opened for business as a Red Lion on June 22, 2001.  (*Id.* ¶ 45.)  The Century hotel opened for business as a Red Lion hotel on June 25, 2001.  (*Id.* ¶ 38.)

Also on June 25, 2001, Hilton, Lehman, and WestCoast signed a confidentiality agreement governing exchange of information about the possible sale of the Red Lion chain.  (*Id.* ¶ 60.)  In August 2001, Hilton management investigated the tax consequences of selling Red Lion and determined that the sale would create substantial tax benefits of between $90 and 150 million.  (*Id.* ¶ 65; Freidman Aff. Ex. 3 at 120 ("Bollenbach Dep.").)

After meeting in person for the first time on September 25, 2001, Hilton and WestCoast representatives negotiated their transaction from a starting proposal by WestCoast of $100 million for a package of properties owned and leased by Hilton.  (Defs.' 56.1  ¶ 67.)  WestCoast encountered financing difficulties, however, and so Hilton withdrew some of the properties in the deal, reducing the price to approximately $50 million.  (Defs.' 56.1 ¶ 67.)  The sale was completed on December 31, 2001.  (Defs.' 56.1 ¶ 69.)

WestCoast assumed operation of the Red Lion chain on January 1, 2002, and took over Red Lion marketing at about the same time.  (Defs.' 56.1 ¶ 72, 83.)  Despite the change in ownership, Hilton's reservation service, Hilton Reservations Worldwide ("HRW"), continued to service reservations for Red Lion until February 2003, when WestCoast implemented a new reservation system and Red Lion reservations were transferred to it.  (Defs.' 56.1 ¶¶ 72-73.)

Plaintiff Becker terminated its Agreement with Red Lion effective May 19, 2003.  (Defs.' 56.1 ¶ 79.)  Plaintiff Century did the same effective October 13, 2003.  (Defs.' 56.1 ¶ 80.)  On October 17, 2003, Plaintiffs filed this lawsuit under diversity jurisdiction.

B.  Procedural History

Plaintiffs' Complaint states five causes of action.  On April 21, 2004, the Honorable

Shira J. Scheindlin, to whom this case was initially assigned, dismissed Plaintiffs' claims for two

separate violations of the New York General Business Laws governing franchises.  *See Century*

*Pac. v. Hilton Hotels Corp.*, No. 03-CV-8258, 2004 WL 868211 (S.D.N.Y. Apr. 21, 2004)

[hereinafter *Century Pac. I*].  Plaintiffs thus have pending causes of action for:  (1) common law

fraud; (2) negligent misrepresentation; and (3) fraudulent omission.[2]

On May 25, 2004, Defendants filed their Answer.  As permitted by Federal Rule of Civil

Procedure 13, the Answer asserted two counterclaims for breach of contract, one against each

Plaintiff.  On June 18, 2004, Plaintiffs replied to the counterclaims, as they were permitted to do

under Federal Rule of Civil Procedure 7(a).  In addition, they purported to state a "Counterclaim

of Plaintiffs" against Red Lion for breach of contract.[3]  This case was transferred to the

undersigned on September 8, 2004.  Defendants made a Motion to Strike Jury Demand on March

30, 2005, which this Court granted on May 10, 2006.

_____

[2] Plaintiffs filed a First Amended Complaint on August 24, 2004, and Defendants filed an
Answer to the First Amended Complaint on September 14, 2004.  These are the operative
pleadings in the case.  Plaintiffs' amendments did not, however, change the claims stated.

[3] What Plaintiffs self-styled as a "Counterclaim" should, in fact, have been brought by
seeking leave to amend the Complaint.  *See* Fed. R. Civ. P. 15(a); *see also Brooks v. Bates*, 781
F. Supp. 202, 207 (S.D.N.Y. 1991) ("[T]he Federal Rules of Civil Procedure do not contemplate
a counterclaim to a counterclaim.") *cited in United Magazine Co. v. Murdoch Magazines
Distrib., Inc.*, No. 03-CV-1440, 2003 WL 223462, at *2 (S.D.N.Y. Feb. 3, 2003).  Nevertheless,
a reply counterclaim is to be treated as a motion to amend the complaint under Rule 15(a).  *See
Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970); *United Magazine*, 2003
WL 223462, at *2.  In order to reach the full extent of Defendants' Motion for Summary
Judgment at issue here, such a motion is deemed made and granted.

<u>II.  Motion to Strike Evidence</u>

A.  <u>Standard of Review</u>

Because "a decision on the motion to strike may affect [the movant's] ability to prevail

on summary judgment," it is appropriate to consider the Motion to Strike prior to the Motion for

Summary Judgment.  *Gucci Am., Inc. v. Ashley Reed Trading, Inc.*, No. 00-CV-6041, 2003 WL

22327162, at *2 (S.D.N.Y. Oct. 10, 2003).  Federal Rule of Civil Procedure 56(e) requires that,

in a summary judgment motion, "[s]upporting and opposing affidavits shall be made on personal

knowledge, shall set forth such facts as would be admissible in evidence, and shall show

affirmatively that the affiant is competent to testify to the matters stated therein."  Therefore, "[a]

court may 'strike portions of an affidavit that are not based upon the affiant's personal

knowledge, contain inadmissible hearsay or make generalized and conclusory statements.'"

*Rockport Co. v. Deer Stags, Inc.*, 65 F. Supp. 2d 189, 191 (S.D.N.Y. 1999) (quoting *Hollander v.

Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999)); *see also Patterson v. County of Oneida*,

375 F.3d 206, 219 (2d Cir. 2004) (holding that inadmissible statements in affidavits submitted in

support of a summary judgment motion are incapable of raising material issues of fact).

Defendants have moved to strike portions of several exhibits submitted by the Plaintiffs in

response to Defendants' motion.  The Court will consider each in turn.

B.  <u>Plaintiffs' Exhibit 3: Deposition of Stephen Bollenbach</u>

1.  <u>Page 7</u>

Defendants assert irrelevancy, and thus inadmissability under Federal Rules of Evidence

401 and 402, of the deposition testimony of Stephen Bollenbach ("Bollenbach") regarding

Hilton's net income for 2001, (Bollenbach Dep. at 7).  The standard for relevance of a given

piece of evidence is broad.  Under Rule 401, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Civ. P. 401.  As Plaintiffs concede, testimony concerning Hilton's net income is relevant only to the issue of damages.  *See Hamm v. Potamkin*, No. 98-CV-7425, 1999 WL 249721, at *2 (S.D.N.Y. Apr. 28, 1999) ("Because a court may take a defendant's financial circumstances, wealth, or net worth into consideration when determining the exemplary damages to be awarded against that defendant, defendants' financial information is certainly relevant to plaintiffs' claims for punitive damages." (internal citations omitted)).  Because damages are not the subject of the present summary judgment motion, however, this testimony is inadmissible here.  Nevertheless, the fate of the summary judgment motion is unaffected by the inadmissibility of this information.

### 2.  Pages 76-77

Bollenbach was asked during his deposition whether he agreed that Plaintiffs' interpretation of language in an e-mail message neither sent nor received by Bollenbach was "fair."  (Bollenbach Dep. 76.)  Bollenbach never agreed with Plaintiffs; however, he stated "I guess you can read it that way."  (*Id.* 77.)  Defendants seek to strike this testimony, arguing that Bollenbach lacked personal knowledge of the e-mail.

As Defendants argue, Bollenbach's testimony cannot be used to prove conclusively that Plaintiffs' interpretation of the e-mail was correct because he had no prior personal knowledge of the e-mail's content.  Considering Bollenbach's position as Hilton's CEO, however, the testimony may be admitted as a statement of a party opponent under Federal Rule of Evidence 801.  Admissions are not subject to the firsthand knowledge rule.  *See* Fed. R. Evid. 801(d)(2)

10

advisory committee note ("The freedom which admissions have enjoyed from . . . the restrictive influences of the opinion rule and the rule requiring firsthand knowledge . . . calls for generous treatment of this avenue to admissibility."); *United States v. Southland Corp.*, 760 F.2d 1366, 1376 n.4 (2d Cir. 1985) (noting that although the Second Circuit had not decided the issue, the Third, Seventh, and Eighth Circuits have found that the firsthand knowledge rule does not apply to admissions admissible under Rule 801(d)(2)). This statement is admissible, however, solely to prove that Bollenbach made the statement "I guess you could read it that way," and not as evidence that the e-mail was actually "read that way" or was intended in a particular way by those who sent and/or received it. Thus, the motion to strike this testimony is denied, but again it does not alter the outcome of Defendants' summary judgment motion.

### C.  Plaintiffs' Exhibit 16: Deposition of Susan Storey

Defendants argue that portions of the deposition of Susan Storey (Friedman Aff. Ex. 16 ("Storey Dep.")), taken pursuant to Federal Rule of Civil Procedure 30(b)(6), should be excluded because they constitute hearsay and lack foundation. Specifically, Defendants seek to exclude testimony given by Susan Storey ("Storey") about a phone call taking place between Becker and a Red Lion executive. Plaintiffs counter that hearsay evidence is admissible at the summary judgment stage if an admissible version of the testimony could be submitted at trial. They contend that the deposition ("Becker Dep.")[4] and declaration of Donald Becker (Friedman Aff. Ex. 72 ("Becker Decl.")), provide documentary support to Storey's otherwise-hearsay testimony.

Hearsay evidence is admissible at the summary judgment stage if the contents would

---

[4] The Parties attached portions of Donald Becker's deposition to various papers, including Defendants' Notice of Motion (Ex. 7) and Plaintiffs' Friedman Affirmation (Ex. 2). The Court will simply refer to evidence drawn from these exhibits as the "Becker Dep."

otherwise be admissible at trial. *See Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial."). At the summary judgment stage, however, inadmissible affidavits may in practice guide the court to documentary evidence in the record supporting their conclusions. *See, e.g., Societe Generale Energie Corp. v. N. Y. Marine & Gen. Ins. Co.*, 368 F. Supp. 2d 296, 299 n.3 (S.D.N.Y. 2005); *Golden Pac. Bancorp v. FDIC*, No. 95-CV-9281, 2002 WL 31875395, at *10 (S.D.N.Y. Dec. 26, 2002).[5]

There are two issues with respect to Storey's testimony. First, Storey stated in her deposition that Gerling told Donald Becker that Red Lion was "not for sale." (Storey Dep. at 33.) Later in her deposition, however, Storey stated she was no longer certain that statement was made. (Storey Dep. at 35:13.) Second, Storey testified more generally that Hilton

_____

[5] Plaintiffs also argued that depositions under Federal Rule of Civil Procedure 30(b)(6), such as the Storey deposition, are not required to be made solely on the basis of the personal knowledge of the individual deponent. This is correct, in that a corporate deponent is obligated to be informed of information within the knowledge and control of the corporation. This does not, however, imply that hearsay statements included in Rule 30(b)(6) depositions do not have to be supported by admissible evidence to be considered for summary judgment purposes.

The cases cited by the Plaintiffs for the proposition that Rule 30(b)(6) allows such testimony speak only to the question of whether the person designated to represent the interests of a corporation for the purposes of a Rule 30(b)(6) deposition *must* have personal knowledge of all the issues discussed at the deposition. *See Twentieth Century Fox Film Corp. v. Marvel Enters.*, No. 01-CV-3106, 2002 WL 1835439, at *2 (S.D.N.Y. Aug. 8, 2002) (noting that a corporate representative has a duty to inform herself about the corporation's position and therefore need not base all testimony on personal knowledge); *SEC v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y. 1992) (stating that Rule 30(b)(6) deponent is not required to testify only about those matters of which they have "actual knowledge"). They do not address whether hearsay evidence made by a corporate deponent without personal knowledge is admissible without additional documentary evidence from the record. Numerous courts have rejected hearsay evidence by a corporate deponent when there is no additional evidence to support the statements. *See, e.g.*, *Digene Corp. v. Ventana Med. Sys., Inc.*, 316 F. Supp. 2d 174, 181 n.10 (D. Del. 2004); *Efferson v. Kaiser Aluminum & Chem. Corp.*, 816 F. Supp. 1103, 1116 n.31 (E.D. La. 1993).

representatives told Donald Becker that Hilton planned to grow the Red Lion brand.

Becker's declaration and deposition state that he was assured that "Hilton's plans for Red Lion were long term," (Becker Decl. ¶ 6), and that he was told "about all the plans for expanding the Red Lion," (Becker Dep. at 47:6). However, Becker does not testify that any Red Lion or Hilton employee told him that Red Lion would not be sold, only that the impression he received from these discussions was that Red Lion would be part of Hilton. (*Id.* at 47:6-8.) He stated he had no other substantive meetings or phone conversations with Red Lion representatives. (*Id.* at 47:12-21.) While this testimony is sufficient to support Storey's general comments about conversations between Hilton and Donald Becker, it does not speak to the specific comment by Gerling to Donald Becker that was alleged.

As a result, Defendants' Motion to Strike to strike Storey's testimony is granted as to her testimony that Gerling told Becker that Hilton would not sell Red Lion; it is denied as to her testimony that Red Lion touted its plans for long term growth at meetings with Becker, as that statement is admissible.

### D. Plaintiffs' Exhibit 20: Notes from Hilton-Lehman Meeting

Defendants moved to strike material from a package of notes relating to a meeting between Hilton and Lehman that was presented as Friedman Affidavit Exhibit 20. They argue that a statement on page 5 is hearsay that does not fall within any exception to the hearsay rule and is also unauthenticated. Plaintiffs argue that the notes are admissible as a business record or as an admission of a party opponent, and that they were authenticated by a Lehman executive who worked on the Red Lion transaction. Defendants have the better of the argument.

The notes at issue were made by a person who did not attend the meeting where the

13

alleged statements were spoken.  Thus, the notes are rank hearsay.  Plaintiffs allege that they fit

within the business records exception to the hearsay rule.  Federal Rule of Evidence 803(6)

requires, however, that a business record be made "at or near the time by, or from information

transmitted by, a person with knowledge. . . ."  Here, the notes were made eight months after the

meeting, and the person alleged to have the requisite personal knowledge has disavowed the

content of the notes.  (Friedman Aff. Ex. 9 at 36:5 ("Hartmeier Dep.").)  In addition, a business

record must be kept in the course of a regularly conducted business activity, and no foundation

has been laid that these notes were kept or recorded in the course of a regularly conducted

business activity.  *See* Fed. R. Evid. 803(6).

Plaintiffs also argue that the notes are admissible as a statement of a party opponent.  *See*

Fed. R. Evid. 801(d)(2).  However, the notes were made by employees of Lehman, which is not a

party to this action, and so Rule 801(d)(2) does not apply.

Because the Friedman Affidavit Exhibit 20 is hearsay that does not fall within any

applicable exception to the hearsay rule, it is inadmissible, and Defendants' motion is granted.

E.  Plaintiffs' Exhibits 25, 34, 35, and 49-61

Defendants argue that Friedman Affidavit Exhibits 25, 34, 35, and 49-61, dating from

Hilton's 1999 merger with Promus and discussing discontinuance of the Red Lion brand, are not

relevant to Hilton's intent in the fall of 2000 when the allegedly false statements were made to

Plaintiffs.  As noted above, the standard for relevance is broad.  *See* Fed. R. Evid. 401.  If Hilton

was dissatisfied with Red Lion's performance when it acquired the brand through the Promus

merger in 1999, it may have probative value that Hilton intended to sell Red Lion soon after

acquisition.  Thus, Defendants' motion to strike these exhibits is denied.

F.  Plaintiffs' Exhibits 26 and 27

Defendants argue that Friedman Affidavit Exhibits 26 and 27, which are newspaper articles containing quotes from Hilton executives (after the sale of Red Lion) stating that Red Lion was "never a good fit" for Hilton, are not relevant and are hearsay.  Newspaper articles offered for the truth of the matter asserted are inadmissible hearsay.  *See Jackson v. Jimino*, No. 03-CV-722, 2007 WL 1160409, at *6 (N.D.N.Y. Apr. 17, 2007) (collecting cases); *Mandal v. City of New York*, No. 02-CV-1234, 2006 WL 3405005, at *1 (S.D.N.Y. Nov. 26, 2006) ("Newspaper articles are usually inadmissible hearsay.").  Because Plaintiffs provide no rationale for their admission other than for the truth of the matter asserted, these exhibits are inadmissible.  Therefore, Defendants' motion to strike this evidence is granted.

G.  Plaintiffs' Exhibit 28

Friedman Affidavit Exhibit 28 is an e-mail from a WestCoast employee to a Lehman employee discussing Hilton's intent to sell Red Lion in May 2001.  This evidence is inadmissible because the author lacks personal knowledge of the issue, and because it is not relevant to Hilton's intent to sell red Lion in the Fall of 2000.  Therefore, Defendants' motion to strike this evidence is granted.

H.  Plaintiffs' Exhibit 70

Friedman Affidavit Exhibit 70 is a November 2001 news article from *Hotel & Motel Management* that quotes a WestCoast vice president and chief communications officer stating that "[i[t was not a long-term strategy of Hilton to keep Red Lion."  Even setting aside the same issues that were fatal to Exhibits 26 and 27, the quoted WestCoast employee lacks personal knowledge of the Defendants' intent.  *See* Fed. R. Evid. 602.  Further, WestCoast's opinions

15

regarding Hilton's business strategy are irrelevant. The motion to strike Exhibit 70 is granted.

I. Plaintiffs' Exhibits 71 and 72

Friedman Affidavit Exhibits 71 and 72 are declarations of Century's Riley and Becker's Donald Becker. Defendants seek to strike paragraphs 6-8, 10, 12, and 14-15 from each of the Riley and Becker declarations, contending that the statements made therein are not based on personal knowledge and amount to inadmissible lay opinion. Rule 56(e) requires that affidavits be made on personal knowledge and set forth facts that would be admissible at trial. Fed. R. Civ. P. 56(e); *see Rockport Co.*, 65 F. Supp. 2d at 191. A court may strike any portions of an affidavit that are not based upon the affiant's personal knowledge or contain inadmissible hearsay, but it may also simply disregard them. *See Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 307 (S.D.N.Y. 2003); *see also Toni & Guy (USA) Ltd. v. Nature's Therapy, Inc.*, No 03-CV-2420, 2006 WL 1153354, at *4 (S.D.N.Y. May 1, 2006) (considering only portions of the parties submissions "to the extent that they comply with Rule 56(e)" in lieu of written determination of merits). The Court will take the latter course here, giving weight only to those portions of the Riley and Becker Declarations that are admissible for Rule 56(e) consideration. Thus, Defendants' Motion to Strike Evidence is granted in part and denied in part.

### III. Motion for Summary Judgment

A. Standard of Review

Summary judgment may be granted where it is shown that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable

inferences in the non-movant's favor. *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "The motion 'will not be defeated merely . . . on the basis of conjecture or surmise.'" *Id.* (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). The materiality of the facts considered by the court will be governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Castro v. Met. Transp. Auth.*, No. 04-CV-1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006); *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990). A court's goal should be to "isolate and dispose of factually insupportable claims." *Celotex Corp.*, 477 U.S. at 323-24.

    B. Fraud

        1. Elements and Required Proof

    "To prove common law fraud under New York law, a plaintiff must show that: (1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the

plaintiff; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the

plaintiff suffered damage as a result of such reliance." *PPI Enters., Inc. v. Del Monte Foods Co.*,

No. 99-CV-3794, 2003 WL 22118977, at \*19 (S.D.N.Y. Sept. 11, 2003) (footnote omitted)

(citing *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 145, 153

(2d Cir. 1995)); *see also Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y.

1996).[6]

Each element of the fraud claim must be shown by clear and convincing evidence, at the

summary judgment stage as well as at trial. *See PPI Enters.*, 2003 WL 22118977, at \*19; *see

also Woo v. Times Enter., Inc.*, No. 98-CV-9171, 2000 WL 297114, at \*4 (S.D.N.Y. Mar. 22,

2000) ("At the summary judgment stage, a party must proffer enough proof to allow a reasonable

jury to find by clear and convincing evidence the existence of each of the elements necessary to

make out a claim for fraud in the inducement." (internal quotation omitted)); *Sauer v. Xerox

Corp.*, 17 F. Supp. 2d 193, 201 (W.D.N.Y. 1998) ("Under New York law, each element of a

fraud claim must be shown by clear and convincing evidence."). "Clear and convincing

evidence is evidence that makes the fact to be proved 'highly probable.'" *Abernathy-Thomas

Eng'g Co. v. Pall Corp.*, 103 F. Supp. 2d 582, 595-96 (E.D.N.Y. 2000) (quoting 1A New York

Pattern Jury Instructions – Civil § 1:64 (3d ed. 1999)). "This evidentiary standard demands a

high order of proof . . . and forbids the awarding of relief whenever the evidence is loose,

equivocal or contradictory." *Abrahami v. UPC Constr. Co.*, 638 N.Y.S.2d 11, 13 (App. Div.

---

[6] The Agreements signed by the Parties include a choice of law clause selecting New York for application to all disputes between them. The Parties have not disputed this, obviating need for further choice of law inquiry. *See 3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 743 (2d Cir. 1999) (noting that parties' consent to New York law obviates further inquiry).

1996) (internal quotations omitted). This means that fraud "'will not be assumed on doubtful

evidence or circumstances of mere suspicion.'" *Fire & Cas. Ins. Co. of Conn. v. 2207 7th Ave.*

*Rest. Corp.*, No. 03-CV-4739, 2004 WL 1933781, at *3 (S.D.N.Y. Aug. 30, 2004) (quoting

*Brayer v. John Hancock Mut. Life Ins. Co.*, 179 F.2d 925, 928 (2d Cir. 1950)). Clear and

convincing evidence may, however, be circumstantial, even on summary judgment. *See United*

*States v. Letscher*, 83 F. Supp. 2d 367, 373 (S.D.N.Y. 1999); *Deem v. Lockheed Corp.*, No. 87-

CV-7017, 1991 WL 196171, at *6 (S.D.N.Y. Sept. 25, 1991) ("Given that evidence of fraud is

rarely susceptible of direct proof and must ordinarily be established by circumstantial evidence

and the legitimate inferences arising therefrom, the lack of other evidence of fraud does not

warrant issuance of summary judgment." (internal quotation omitted)).

     As the moving party, Defendants have the burden of demonstrating an absence of clear

and convincing evidence substantiating Plaintiffs' claims. *See Enzo Biochem, Inc. v. Johnson &*

*Johnson*, No. 87-CV-6125, 1992 WL 309613, at *3 (S.D.N.Y. Oct. 15, 1992). "If, as to the issue

on which summary judgment is sought, there is any evidence in the record from any source from

which a reasonable inference could be drawn in favor of the nonmoving party, summary

judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

When deciding a common law fraud claim, however, the evidence presented by the non-moving

party in opposition to summary judgment must be enough to make "any inference of fraud . . .

'unequivocal.'" *Miller v. Grigoli*, 712 F. Supp. 1087, 1095 (S.D.N.Y. 1989) (quoting *Manchel*

*v. Kasdan*, 144 N.Y.S.2d 694, 695 (App. Div. 1955), *aff'd*, 134 N.E.2d 687 (N.Y. 1956)); *see*

*also Sea-Land Serv. Inc. v. Remington Rand Corp.*, No. 84-CV-177, 1986 WL 8862, at *3

(S.D.N.Y. Aug. 7, 1986). Still, summary judgment should be considered skeptically in cases

alleging fraudulent inducement, because the issues typically turn on the parties' credibility as to

their state of mind. *See Sound Video Unlimited, Inc. v. Video Shack Inc.*, 700 F. Supp. 127, 135

(S.D.N.Y. 1988) (denying summary judgment on fraud claim because factual issue of

defendants' intentions at time of transaction "hinges upon the credibility of the various parties");

*ACLI Int'l Commodity Servs., Inc. v. Banque Populaire Suisse*, 609 F. Supp. 434, 449 (S.D.N.Y.

1984) ("summary judgment should be cautiously invoked in fraudulent inducement cases, which

raise issues that often turn on credibility or inference, such as intent and reliance").  Thus,

summary judgment should be denied when the plaintiff demonstrates the existence of specific

facts from which a jury might infer that a defendant engaged in a scheme or plot to defraud the

plaintiff.  *See, e.g., Enzo Biochem*, 1992 WL 309613, at \*12.

### 2.  Material False Statement

To satisfy the first element of common law fraud, Plaintiffs must show by clear and

convincing evidence that Defendants made a material false representation.  *See PPI Enters.*,

2003 WL 22118977, at \*19.  Plaintiffs have tendered several persons who provided sworn

testimony that they believed they were reassured during the negotiations over Plaintiffs'

franchise agreements that Hilton had no intention of selling Red Lion.  First, Teles, a Century

representative in its negotiations with Hilton, testified in his deposition that, in September 2000,

he was "led to believe . . . that no one would even dream of believing that Hilton would sell [Red

Lion]" and that "assurances were given that [a sale of Red Lion] was out of the question."

(Friedman Aff. Ex. 17 at 52:9, 53:25 ("Teles Dep.").)  Second, Riley, Century's President,

testified about discussions he had with Gerling, the Red Lion salesperson, in September or

October 2000.  According to Riley, when he told Gerling that Century did not want to buy a Red

20

Lion franchise if Hilton was going to sell Red Lion, Gerling told him: "don't worry, everything's going to be fine." (Riley Dep. 54:4.) Third, Roland Sardaczuk, Century's corporate representative, testified that Murray, the Hilton executive in charge of Red Lion, and Gerling each represented to Century in late 2000, both in person and on the telephone, that Hilton intended to keep the Red Lion brand. (Sardaczuk Dep. 102:16.)[7] Finally, Storey, Becker's representative, testified that Hilton representatives told Donald Becker that Hilton was going to grow and "promote" the Red Lion brand, and that the sales representatives spoke of Hilton's five-year plan for Red Lion. (Storey Dep. 35:18, 40:6.) These representations were allegedly made during the fall of 2000. (*Id.* 23:6.)

Defendants counter that each deponent specifically admitted that she or he recognized, at the time negotiations were underway, that Hilton retained a right to sell Red Lion, and, in some instances, the deponent admitted that Hilton explicitly negotiated to maintain the right to sell in the face of concerns expressed by Plaintiffs. (Teles Dep. 52:5-66:17; Riley Dep. 52:7-54:18; Sardaczuk Dep. 105:17-24; Storey Dep. 39:20-23; Becker Dep. 84:22-85:9.) In addition, Defendants deny that any of their representatives made a promise that Hilton would never sell Red Lion (Defs.' 56.1 ¶ 41), and point to Riley's admission that "Gerling never ever said they wouldn't sell" Red Lion. (*Id.* ¶ 32; Riley Dep. 52:10-12..)

Plaintiffs' theory is that "at the very time Plaintiffs were asked to risk their business on a relationship with the 'Hilton family,' the leadership of this 'family' was intending to sell off Red Lion." (Pls.' Mem. of Law in Opp. to Def.'s Motion for Summ. Judgment at 1 ("Pls.' Mem.").)

---

[7] The Parties attached portions of Sardaczuk's deposition to various papers, including Defendants' Notice of Motion (Ex. 5) and Plaintiffs' Friedman Affirmation (Ex. 13). The Court will simply refer to evidence drawn from these exhibits as the "Sardaczuk Dep."

Even assuming the truth of this assertion, and therefore that a representation to the contrary would be materially false, Plaintiffs still need to show a triable issue as to whether there was at least one materially false *statement.* It is black letter law that a "representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." Restatement (Second) of Torts § 530(1). But in *Sabo v. Delman*, the leading New York Court of Appeals case cited for this point in Judge Schiendlin's earlier opinion in this case, the representation at issue was defendant's statement to plaintiff that if plaintiff "would" take a specified act, defendant "would finance . . ." and "would use best efforts . . ." that he actually had no intention of undertaking. 143 N.E.2d 906, 907 (N.Y. 1957). The *Sabo* court held: "a promise . . . made with a preconceived and undisclosed intention of not performing it . . . constitutes a misrepresentation." *Id.* at 908. The Second Circuit has focused on the fact of a *promise* constituting the material false representation that gives rise to a claim for fraudulent inducement. *See Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) ("if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact. . . ."); *see also Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (stating that "promise" is ground for fraud action where there was intent not to perform at time promise was made); *cf. Century Pac. I*, 2004 WL 868211, at *20 (denying Defendants' motion to dismiss because Plaintiffs could make factual showing about fraud of "defendant's oral promises"). Further, as a basic principle of claim construction, each Plaintiff must make out a triable issue of fact regarding whether Defendants made a misrepresentation to it. There are important differences in what has been alleged by the two Plaintiffs.

Century has narrowly met its burden of production to show that a reasonable finder of

fact could determine by clear and convincing evidence that Defendant made a material false *representation*. As described above, Teles testified about what he was "led to believe" and about what "assurances were given."[8] But the belief that Teles may have extracted from the penumbra of Defendants' conduct is not sufficient to form a material false representation. To borrow language from songwriter Dusty Springfield, "[w]ishing and hoping and thinking and praying, planning and dreaming, each night of [Hilton's] charms" cannot constitute a material false representation. Century has also pointed to Riley's testimony that Gerling told him: "don't worry, everything's going to be fine." Neither the Teles nor the Riley testimony admits of facts that, even if found by a jury, would be sufficient as a matter of law to constitute the kind of fraudulent inducement that the New York Court of Appeals considered in *Sabo*. In *Sabo*, the Defendant made an explicit collateral promise; here, Teles and Riley claim only to have received the broad sense that Defendants would forebear from certain action, without pointing to a particular representation by Defendants so stating. On Century's behalf, only Sardaczuk has made the requisite allegation of a representation by saying that Murray and Gerling each *represented* to Century that Hilton intended to keep the Red Lion brand. This is sufficient to raise a triable issue of fact, albeit just barely, regarding whether Defendants made a materially false statement to Century about its present intentions in the fall of 2000.

Becker has not presented a triable issue of fact on the same question regarding statements made to it. Storey's testimony that Donald Becker was told Hilton planned to "promote" and

---

[8] Teles deposition testimony with reference to assurances is ambiguous about whether the "assurances" he claims to have received were explicit. Because Century has presented testimony from Sardaczuk, another witness, that is on its own sufficient evidence for a factfinder to find material false representation, the Court need not decide whether the Teles deposition would, on its own, offer sufficient evidence on this element to survive summary judgment.

had a five-year plan for the Red Lion brand does not, by itself, show a representation on the materially false issue alleged by the Plaintiffs.  Plaintiffs have not disputed the veracity of these alleged statements.  (Defs.' 56.1 ¶ 21 ("Murray generated a five year plan for Red Lion dated June, 2000, calling for aggressive expansion of the brand."); Pls.' 56.1 ¶ 21 ("Not disputed.").)  Like Riley, who acknowledged he was never told by Gerling that Hilton would not sell Red Lion, Becker did not speak of having been made a representation, only of having received an "impression."  (Becker Dep. At 47:6-11).  Even if taken as true, the statements pointed to by Becker do not amount to the representations inherent in a fraudulent inducement that the Court of Appeals deemed tortious in *Sabo*.  Thus, Becker has failed to raise a triable issue of fact as a matter of law.[9]

### 3.  Intent to Defraud

Plaintiffs must also establish the second element:  that Defendants intended to defraud Plaintiffs at the time their representatives made material false representations.  *See PPI Enters.*, 2003 WL 22118977, at *19.  Plaintiffs' theory of the fraud is that Defendants' representatives intentionally misrepresented Hilton's plans for the brand because such plans called for franchising that could not be accomplished without such misrepresentation.  (Pls.' Mem. at 5).  "A present expression of the intent to perform a future act is actionable as fraud only if actually made with a preconceived and undisclosed intention of not performing it."  *Tanzman v. La Pietra*, 778 N.Y.S.2d 199, 201 (App. Div. 2004) (internal quotation omitted).  In other words, "a

---

[9] Although the Court need not reach the issue, it is also unclear that the particular statements alleged by Becker would meet the materiality threshold inherent in this element of the claim.  Becker has not offered any evidence that the existence and not the details of a five-year plan, in contrast with the alternative of some other business plan, had any significance.

claim based upon statements of future intention . . . requires proof of a present intent to deceive." *Marcraft Recreation Corp. v. Francis Devlin Co.*, 506 F. Supp. 1081, 1087 (S.D.N.Y. 1981); *see also Cornock v. Murnighan*, 727 N.Y.S.2d 803, 804 (App. Div. 2001) (upholding summary judgment for defendant where plaintiff failed to provide any evidence that defendant did not intend to fulfill promise at the time it was made); *Non-Linear Trading Co. v. Braddis Assocs.*, 675 N.Y.S.2d 5, 13 (App. Div. 1998) (noting that a statement of future intention is fraudulent only if the speaker never intended to honor the promise).  Intent to deceive must be shown by evidence of "'guilty knowledge or willful ignorance.'"  *Schwartz v. Newsweek, Inc.*, 653 F. Supp 384, 390 (S.D.N.Y. 1986) (quoting *Mfrs. & Traders Trust Co. v. Sapowitch*, 72 N.E.2d 166, 168 (N.Y. 1947)).  Plaintiff need not come forward with direct evidence, as "fraudulent intent 'is rarely susceptible to direct proof and must ordinarily be established by circumstantial evidence and the legitimate inference arising therefrom.'"  *Enzo Biochem*, 1992 WL 309613, at *11 (quoting *Goshen Litho, Inc. v. Kohls*, 582 F.Supp. 1561, 1564 (S.D.N.Y. 1983)); *see also Allen v. West-Point Pepperell, Inc.*, 11 F. Supp. 2d 277, 284 (S.D.N.Y. 1997) (same).  Therefore, "a Plaintiff's claim of fraudulent inducement can be sustained without reference to direct evidence of fraudulent intent if Plaintiff pleads and provides evidence of facts that support a 'strong inference that the defendants possessed the requisite fraudulent intent.'" *Enzo Biochem*, 1992 WL 309613, at *11 (quoting *Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989)).

Though Plaintiffs contend that nearly every act by Defendants was part of a grand scheme to defraud franchisees and sell off Red Lion, Plaintiffs primarily argue that Defendants' intent to defraud Plaintiffs at the time they were negotiating the franchise agreements can be circumstantially inferred from five sources:  (1) Hilton documents from the 1999 Hilton-Promus

25

merger that repeatedly model proposals to "discontinue," "eliminate," or "curtail" Red Lion

(Friedman Aff. Exs. 25, 34-35, 49-61); (2) an e-mail from Jim Dina, chief operating officer of

Red Lion, stating that Hilton should consider adding twenty to twenty-five Red Lions to the

chain in the year 2000, nearly double the planned-for number, because "this will better position

Red Lion and open more options to Hilton (more growth, set up for sale etc.)" (Friedman Aff.

Ex. 29); (3) Hilton's treatment of Red Lion after the Hilton-Promus merger and during the

implementation of its "Five-Year Plan," including specifically the fact that Hilton did not

integrate Red Lion into Hilton's guest rewards program; (4) Hilton's corporate conduct during

early 2001, including the start of its negotiations to sell Red Lion; and (5) the fact that the

benefits Hilton gained from the sale of Red Lion, and its proffered reasons for selling the brand,

were apparent to its executives long before the decision to actually sell it.

Defendants make two primary counterattacks. First, they challenge the legal sufficiency

of some of this evidence, arguing that much of it is not probative of fraudulent intent as a matter

of law. Second, they contend that any remaining evidence is insufficient to meet Plaintiffs'

burden of showing fraudulent intent by clear and convincing evidence. Specifically, Defendants

argue that the 1999 merger documents and Hilton's conduct after signing the franchise

agreements are not probative of fraud, and therefore should not be considered on summary

judgment. The Court will consider the probative value of each in turn.

Essentially all of the thirteen Hilton corporate documents from the Hilton-Promus merger

(several of which appear to be duplicates) state that, in approximately September 1999, Hilton's

plan for Red Lion was to discontinue it.[10]  Defendants do not dispute this.  Instead, they argue

that this evidence is too old to be considered as probative of Hilton's intent at the time of the

alleged making of false statements, approximately October 2000.[11]  They offer four cases that

support their position.

Defendants first point to a concurring opinion of a New York Court of Appeals judge that

speaks to the lack of utility, in determining the actual present intent of a person who is mentally

incompetent, of such person's prior comments.  *In re Westchester County Medical Center ex rel.*

*O'Connor*, 531 N.E.2d 607, 616-17 (N.Y. 1988) (Hancock, Jr., J., concurring).  The Court

cannot help but remark at the oddity of this citation, given that Hilton, as a corporate entity,

surely was not, is not now, and has never been mentally incompetent.  The Court accepts the

point that a past expression of state of mind cannot itself prove present state of mind.  But

*O'Connor* cannot offer Defendants any additional help:  it deals with the "impossibility [of]

factual determination of [an] incompetent patient's actual desire."  *Id.* at 536.  Surely, *O'Connor*

does not trump the well-accepted understanding in a common law fraud action that fraudulent

intent "must ordinarily be established by circumstantial evidence and the legitimate inference

arising therefrom."  *Enzo Biochem.*, 1992 WL 309613, at *11 (internal citations and quotations

omitted).  The Court accepts that the 1999 evidence is not direct proof or itself sufficient proof of

---

[10] Though many of the documents are not dated, those that include dates are from
approximately September 1999, at least twelve months prior to any of the alleged false
statements.

[11] Defendants echo this point in their Motion to Strike Evidence by arguing that the 1999
statements are irrelevant to the issue of whether Hilton had a present intent to sell Red Lion
during early 2001.  (Defs.' Mot. Strike Evid. ¶ 4.)  While the Court has ruled that this evidence is
relevant, it alone cannot support the conclusion that Hilton intended to sell Red Lion several
years later under different circumstances.

fall 2000 intent but, as discussed, *supra*, with respect to Defendants' Motion to Strike evidence, it is competent evidence to raise a triable issue of fact.

Defendants cite three additional cases that are more on point.  In *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, the court upheld summary judgment for a defendant that had promised to stay in business "forever" while negotiating the sale of its business.  975 F.2d 1192, 1205 (5th Cir. 1992).  The court held that the plaintiff had failed to produce sufficient evidence of the defendant's fraudulent intent.  *Id.*  In *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, the Ninth Circuit upheld summary judgment for defendants where defendant manufacturer had given plaintiff distributors a "target date" and made general assurances of intent to stay open.  818 F.2d 1466, 1471 (9th Cir. 1987).  The Court concluded on the point: "Only an incorrigible optimist could understand that as . . . a promise to remain open without regard to sales . . . ."  *Id.*  Finally, in *General Signal Corp. v. MCI Telecommunications Corp.*, the court affirmed a directed verdict for defendant where the only evidence of fraudulent intent in a business representation was a series of eighteen-month-old memos discussing a possible "sell or shutdown" strategy.  66 F.3d 1500 (9th Cir. 1995).  Applying New York law, the court held that this evidence was insufficient as a matter of law to prove fraudulent intent at the time of the promise.  *Id.* at 1511-12.  In none of these cases, however, did any court refuse to consider the prior statements as evidence of fraudulent intent.  Each of these courts found that the dated evidence did not itself rise to the clear and convincing standard, but none deemed such evidence irrelevant or not probative.  Moreover, this case is distinguishable in that there is other evidence Plaintiff can offer to prove Defendants' intent.  Therefore, the Court will consider the 1999 documents when determining whether Defendants had a present intent to defraud at the

28

time the allegedly false statements were made. It does so with the recognition, however, that
such evidence by itself cannot get Plaintiffs to first base.

Defendants also contend that Hilton's actions after the signing of the franchise
agreements, specifically its March 2001 meeting with Lehman and its June 2001 meeting with
WestCoast, should not be considered evidence of Hilton's fraudulent intent. Both events
occurred after the franchise agreements were signed but before the Plaintiffs' hotels opened as
Red Lions. The relevant period for determining whether a person had a "present intent" to
defraud is the time the allegedly false statements in question were made; here, that is during the
franchise negotiations. *See Tanzman*, 778 N.Y.S.2d at 201 (dismissing claim where plaintiff
failed to provide evidence of fraudulent intent "at the time [the promise] was made.").

Moreover, as Defendants note, mere failure to perform a previous promise is alone
insufficient, as a matter of law, to raise an inference of intent to defraud at the time the promise
was made. *See Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*,
785 F. Supp. 411, 421 (S.D.N.Y. 1992) ("It is well settled that fraudulent intent not to perform a
promise cannot be inferred merely from the fact of nonperformance." (internal quotation
omitted)); *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 664 (S.D.N.Y. 1991) ("The law
is well settled, however, that a party may not establish fraudulent intent solely from the
non-performance of the future event. The defrauded party must allege specific facts showing
that the promisor intended not to honor his obligations at the time the promise was made."
(internal citations omitted)).

Plaintiffs argue that the Court should consider later events because they corroborate their
version of the facts. They cite a single case for this proposition, *DynCorp v. GTE Corp.*, 215 F.

Supp. 2d 308 (S.D.N.Y. 2002). In *DynCorp*, defendant had covenanted to provide certain monthly financial reporting to plaintiff prior to closing of a business sale by defendant to plaintiff. Plaintiff alleged that defendant had provided false information, and the *DynCorp* court held that plaintiff could amend its complaint to state a common law fraud claim based on the provision of false information. *Id.* at 327-28. Plaintiffs' reliance on *DynCorp* is misplaced, however, because the court there – ruling on a motion to dismiss and measuring the legal sufficiency of a claim, not making any evidentiary conclusions – concluded that "the Purchase Agreement itself does not preclude [plaintiff] from suing [defendant] for making allegedly false and misleading representations and disclosures incident to closing." *Id.* at 328. *DynCorp* says nothing about inference of fraud in a promise of intent when later action is incongruous with such intent. Regardless, the present case is distinguishable as the Parties here had no contractual arrangement to provide any information about Hilton's interest in selling Red Lion, and Plaintiffs here had no explicit covenant right to continual information from Defendants.

Still, the evidence of Defendants' post-franchising sale of Red Lion is helpful to Plaintiffs, even though, standing alone, it would be insufficient to get Plaintiffs past summary judgment. The question remains whether Defendants' post-negotiation conduct combined with the 1999 merger documents, the Dina e-mail, Hilton's refusal to integrate Red Lion into the Hilton guest reward program, and Hilton's allegedly weak reasons for selling Red Lion in June 2001 could support a reasonable finding, by clear and convincing evidence, that Defendants had a present intent to defraud the Plaintiffs when Defendants' representatives stated in Fall 2000 that Hilton had no intention to sell the Red Lion brand. As noted, under New York law, to meet this standard the evidence cannot be "loose, equivocal, or contradictory." *Chrils v. Nassau*

*County Civil Serv. Comm'n*, 716 N.Y.S.2d 585, 586 (App. Div. 2000).

Plaintiffs have failed to meet this test. Plaintiffs and Defendants have few disputes over the facts in this case, and so the narrow issue on this claim element for summary judgment is whether the combined inferences from Plaintiffs' evidence is such that a rational finder of fact could conclude by clear and convincing evidence that Defendants intended to defraud the Plaintiffs at the time their representatives made material false representations. The Court concludes that even giving every favorable weight that could arise from credibility determinations at trial, a reasonable fact finder still could not hold for Plaintiffs.

The Court is guided here by *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, in which the Supreme Court reinforced the obligation of district judges to enter summary judgment where "the factual context renders [a plaintiff's] claim implausible." 475 U.S. 574 (1986). *Matsushita* teaches that where "the claim is one that simply makes no economic sense, [a plaintiff] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id. at 587.* As the Court explained, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.

The Court does not read much inferential value into the 1999 merger documents. Even accepting that analysts at Hilton, prior to Hilton taking ownership of Red Lion through its merger with Promus, modeled and conducted financial planning weighing the merger with a discontinuance or divestiture of Red Lion, the Court cannot see how this shows evidence of a fraudulent plan by the executives in charge of Red Lion after the merger. Murray, who ran Red Lion for Hilton, had been a Promus employee prior to the merger, and he was not even part of the Hilton company when its merger analysts were contemplating a Red Lion discontinuance.

31

That such analysts contemplated such a discontinuance is of little probative value to the intent with which Murray and his team ran the brand following the merger.  Indeed, Plaintiffs accepted that it was Murray who developed the five-year plan for the brand on assuming its leadership in 2000.  (Defs.' 56.1 ¶ 21; Pls.' 56.1 ¶ 21.)  Plaintiffs have not made anything more than bare allegation that the 1999 Hilton modeling of a Red Lion discontinuance was translated into Murray's plan.  No amount of credibility analysis at a trial would change such assessment.

Plaintiffs' next evidence of alleged fraudulent intent is the Dina e-mail from December 1999.  (Friedman Aff. Ex. 29)  Plaintiffs quote from this e-mail to argue that Dina, then the executive in charge of Red Lion, articulated a plan to "accelerate the growth of Red Lion in 2000 . . . [to] better position Red Lion . . . for sale."  (Pls.' Mem. at 1; Pls.' 56.1 ¶ 21.)  This is a deeply misleading selective quotation as the ellipses employed by Plaintiffs entirely distort the meaning of the original document.[12]  The e-mail message actually reads: "I think this will better

---

[12] More disturbingly, Plaintiffs selectively quote a portion of the Five-Year Plan for Red Lion, the entirety of which appears in an affidavit.  Plaintiffs' brief reads:

> It was equally clear to Hilton's executives that they had to make a compelling case that Hilton intended to keep Red Lion, because any perceived weakness in the system would have serious repercussions on their ability to sell franchises: **"The loss of these hotels from our brand will have a negative impact on Red Lion's ability to franchise, particularly as we continue to convince the franchise community of Hilton's desire to grow the brand."**  (Pl.'s Mem. 5 (emphasis in original).)

In the context of Plaintiffs' argument, it appears that this sentence is an admission by Defendants that they were aware that a divestiture of Red Lion by Hilton would undermine its growth, and they were therefore seeking to hide the fact from the franchise community.  What a difference a word makes.  The actual passage begins:  "The loss of these *two* hotels," which makes clear to the reader of the excerpted passage that the text was not referring to Red Lion hotels generally.  In fact, this passage of the Five-Year Plan is referring to two underperforming Red Lions, which the Plan says Hilton *should not sell*.  (Friedman Aff. Ex. 38 at HL06462.)  Plaintiffs misquote this passage repeatedly throughout their brief.  The Court is unable to see how these repeated

position Red Lion and open more options to Hilton (more growth, set up for sale, etc.)."
(Friedman Aff. Ex. 29 at HL10988.)  Dina further clarified the e-mail in his deposition, stating
that "set up for sale" simply referred to "one of many options of increasing the value of the
business," and was not a reflection of any discussion of setting Red Lion up for sale or of need to
set the company up for sale.  (Dina Dep. 136).  Indeed, the document speaks for itself to the
same effect:  that the officers of a public corporation were engaged in positioning its portfolio of
assets for expansion so as to maximize shareholder return by constantly reevaluating options for
further development, sale, or other dispositions, merely reflects officers carrying out their
fiduciary duties to shareholders.  The Court does not see any evidence of Defendants' fraudulent
intent, circumstantial or otherwise, in the Dina e-mail.

        Plaintiffs' claim that Hilton's decision not to integrate Red Lion into the Hilton guest
rewards program has evidentiary value of Defendants' fraudulent intent.  (Pls.' Mem. 6).  The
Court disagrees.  The Red Lion Club guest loyalty program was created under Dina's leadership
prior to the 1999 Hilton merger.  (Defs.' 56.1 ¶ 15.)  While Plaintiffs may have thought Hilton's
larger program, and not the Red Lion Club, to be the optimal cat's meow, there is no evidence
that they bargained for participation in it.  Indeed, they knew during the entirety of the franchise
negotiations that Red Lion hotels were not part of the larger Hilton program.  Plaintiffs' private
hopes that Hilton management would change the Red Lion loyalty program affiliation – or even
their decision to purchase a Red Lion franchise on seeing the opportunity to lobby from within
the system for such a change in the future – cannot convert the ordinary business fact of Red

--------

misquotes could have been inadvertent and is deeply troubled by conduct of Plaintiffs' counsel
in submitting them, even if it was mere negligence of oversight.  Plaintiffs' counsel are
admonished never to repeat such misconduct in submissions to this or any other court.

Lion's standalone loyalty program into meaningful evidence of Defendants' fraudulent intent.

Lastly, Plaintiffs ask the Court to find evidence of fraudulent intent from the asserted fact that "it was clear to those 'in the know' that Hilton was never interested in keeping Red Lion long term." (Pls.' Mem. 8.) In support of this assertion, Plaintiffs cite a memorandum from Hilton CFO David Sherf to Hilton's board of directors listing factors in support of the sale to WestCoast. (*Id.*; Friedman Aff. Ex. 41.) Plaintiffs' argument for an inference of fraudulent intent is, effectively, that the factors cited by Sherf in support of the sale in November 2001 had been "equally true and available to Hilton at the time it purchased Red Lion in 1999." (Pls.' Mem. 8.) Even accepting Plaintiffs' view that there was nothing new in the factors supporting a sale as of November 2001, the Court cannot accept Plaintiffs' claim that the prior existence of data is evidence of fraudulent intent on the part of Defendants in negotiating the franchise agreements at issue. As discussed above, that a large corporation such as Hilton would constantly reevaluate its portfolio of companies to make decisions maximizing return to shareholders is evidence of appropriate fiduciary conduct and not of fraudulent intent. That Defendants, both as corporate entities and in the person of their officers and employees, might have been aware that Red Lion was a reasonable candidate for divestiture by Hilton does little or nothing to suggest that Defendants had a corporate strategy implying fraudulent intent. Just as the ultimate sale in 2001 itself cannot infer fraudulent intent at the time of the franchise agreements, so it is that the reasons justifying such ultimate sale and making it a rational act for a large corporation cannot infer fraudulence in a statement of intent at the time of making of the Franchise Agreements.

In sum, even giving every favorable inference that might arise at trial to Plaintiffs as non-

movants, no reasonable finder of fact could find from the evidence put forward the requisite

fraudulent intent by Defendants in their alleged making of false material representations.

Applying the *Matsushita* standard, Plaintiffs' theory of Defendants' intent is entirely implausible

given the evidence presented.

### 4.  Reasonable Reliance

The third element of common law fraud is reasonable reliance.  *See PPI Enters.*, 2003

WL 22118977, at *19.   "Under New York law, a plaintiff must establish that his reliance was

justifiable, both in the sense that the party claiming to have been defrauded was justified in

believing the representation and that he was justified in acting upon it."  *Compania Sud-*

*Americana de Vapores*, 785 F. Supp. at 419.  "[W]hen matters are peculiarly within the

knowledge of the defendant, a plaintiff may rely on defendant's representations without

prosecuting an investigation, as he has no independent means of ascertaining the truth."  *Id.*

However, "if the plaintiff 'has the means of knowing, by the exercise of ordinary intelligence,

the truth, or the real quality of the subject of the representation, he must make use of those

means, or he will not be heard to complain'" that he was reasonably induced to rely on the

defendant's alleged misrepresentations.  *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91,

98 (2d Cir. 1997) (quoting *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80-81 (2d Cir. 1980)).

Defendants point to the integration clause in the Agreement,[13] which purports to make the

---

[13] Paragraph 16(d) of the franchise agreements, (Friedman Aff. Exs. 45, 46) reads, in part:

> You and we acknowledge that we want all terms of this business
> relationship defined in this written agreement, and that neither of
> us wants to enter into a business relationship with the other in
> which any terms or obligations are subject to any oral statements
> or in which oral statements serve as the basis for creating rights or

Agreement supercede any oral or written representations that predated the signing of the

Agreement, as well as the contractual right to sell in each Agreement, to argue that neither

Plaintiff can claim to have reasonably relied on any pre-contract statements made by Defendants

promising not to sell Red Lion.  Judge Scheindlin addressed these arguments at the Motion to

Dismiss stage.  Specifically, Judge Scheindlin ruled that these arguments cannot be used as

complete defenses, stating that neither the integration clause in the Franchise Agreements nor the

inclusion of the contractual right to sell would prevent Plaintiffs from arguing that they

reasonably relied on Defendants' statements regarding whether the Red Lion brand would be

sold.  *See Century Pac. I*, 2004 WL 868211, at \*6.  As Judge Scheindlin observed, "[u]nder New

York law, a general merger clause precludes neither an action for fraud in the inducement nor

parol evidence concerning fraudulent representations." *Id.* at \*6.; *see also Sabo*, 143 N.E.2d at

909 (N.Y. 1957) ("[A] contractual promise made with the undisclosed intention not to perform it

constitutes fraud and, despite the so-called merger clause, the plaintiff is free to prove that he

was induced by false and fraudulent misrepresentations. . . ."); *Lee v. Goldstrom*, 522 N.Y.S.2d

---

obligations different than or supplementary to the rights and
obligations set forth in this Agreement.  Therefore, you and we
agree that this Agreement and its attachments will be construed
together and will supersede and cancel any prior and/or
contemporaneous discussions or writings (whether described as
representations, inducements, promises, agreements or by any
other term) between us.  We each agree that we placed, and will
place, no reliance on any such discussions or writings.  You agree
that no claims, representations or warranties of earnings, sales,
profits, success or failure of the Hotel have been made to you. This
Agreement and its attachments is the entire agreement between us
and contains all of the terms, conditions, rights and obligations
between us with respect to the Hotel and any other aspect of the
relationship between us.

917, 918 (App. Div. 1987) ("[T]he general disclaimer and merger clause in the contract does not preclude an action to recover damages for fraud in the inducement nor does it bar parol evidence concerning the alleged fraudulent representations set forth in the complaint.").

There are two situations where a merger clause will preempt an action for fraud under New York law.  The first is where the merger clause expressly references a specific subject of prior representations.  For the reasons stated in Judge Scheindlin's opinion, the merger clause in the Franchise Agreements does not fall within this exception.  *See Century Pac. I*, 2004 WL 868211, at *6.  Because the merger clause at issue here was merely a general merger clause, rather than one that related to a specific subject matter, the Agreements do not demonstrate that Plaintiffs' reliance was unreasonable.

The second situation where a merger clause will defeat a claim of reasonable reliance is where the clause "was included in a multi-million dollar transaction that was executed following negotiations between sophisticated business people and a fraud defense is inconsistent with other specific recitals in the contract."  *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 165 F. Supp. 2d 615, 622 (S.D.N.Y. 2001), *aff'd in relevant part*, 343 F.3d 189 (2d Cir. 2003); *see also Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir. 1997) (holding that sophisticated investor with notice of material facts undocumented in the agreement relied unreasonably on seller's representations of a report's content by not insisting on seeing the report); *Rodas v. Manitaras*, 552 N.Y.S.2d 618, 620 (App. Div. 1990) ("a party . . . put on notice of [undocumented] material facts . . . may truly be said to have willingly assumed the business risk that the facts may not be as represented . . . [and] will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his

37

predicament.").  When evaluating the reasonableness of a party's reliance in a sophisticated

transaction, the Court is to look to "the entire context of the transaction, including factors such as

its complexity and magnitude, the sophistication of the parties, and the content of any

agreements between them." *Lazard Freres*, 180 F.3d 1531, 1541-43.  This is the nature of the

analysis here, and it is appropriately undertaken separately with respect to each Plaintiff.

Plaintiff Century was a reasonably sophisticated party to its agreement.  Riley, Century's

president, has been in the hotel business since the 1960s and has built and operated major hotels

in numerous cities.  (Defs.' 56.1 ¶¶ 2-4.)  He previously owned franchise hotels in other national

hotel brand franchise systems.  (*Id.* ¶ 4.)  Century was represented by an attorney during the

transaction.  (*Id.* ¶ 29.)  Century's representatives explicitly negotiated with Hilton regarding its

right to sell Red Lion.  They testified to their awareness of the risks created by Hilton's right to

sell and to their attempt to eliminate such rights from the contract.  (Teles Dep. 52:5-62:17.)

Century was partially successful, negotiating the Three-Year Window provision allowing it to

terminate the franchise agreement if Hilton sold the Red Lion chain during a specified period.

(Friedman Aff. Ex. 45 ¶ 14(f).)  Taken as a whole, the transaction was of substantial magnitude

for Century but, although fairly called a complex transaction, there is no evidence this franchise

agreement was especially complex in the context of the type of business transactions with which

Century was familiar.

Applying the *Lazard Freres* factors:  (1) this was precisely the type of transaction within

Century's expertise and experience and was of a magnitude to focus Century's corporate

attention; (2) Century was a sophisticated party, represented by counsel, that understood the

nuances of the franchise agreement and the issues at stake; and (3) the content of the Agreement

and the negotiation history expressly reflect Century's awareness of the issue of which it now

complains, that is, Hilton's right to sell the Red Lion brand. Weighing these factors, the Court

finds, based on the undisputed facts, that Century could not reasonably have relied on the alleged

material false representations. Century understood the risk of a Red Lion sale, it bargained for

certain protections against them, and it reached its own decision to bet that Hilton's interests in

the future of the Red Lion brand would be beneficial to it. Surely, Century understood that off-

hand oral comments of sales representatives in the course of negotiations could not bind a large,

publicly-traded company in overall business decisions, the incentives of which Century plainly

understood at the time of the transaction. At bottom, Riley should have understood that when

Gerling told him "don't worry, everything's going to be fine," it could not have been more than a

statement of his opinion. *See* Restatement (Second) of Torts § 538A ("A representation is one of

opinion if it expresses only . . . [the maker's] judgment as to quality, value, authenticity, or other

matters of judgment."). In the total context of the transaction, no reasonable factfinder could

deem Century's reliance on Defendants' alleged material false representations to have been

reasonable.

In contrast, Plaintiff Becker was run by Donald Becker, a contractor who has constructed

more than twenty-one motels, and has since 1990 operated a motel in Moab Valley, Utah.

(Defs.' 56.1 ¶¶ 8-9.) Although Donald Becker is familiar with the hotel industry, Becker was, on

the whole, somewhat less sophisticated than Century in the business of hotel franchising. Becker

was not represented by counsel during the transaction and did not seek outside counsel during

the negotiations. (Becker Dep. 48:13-18.) Applying the *Lazard Freres* factors: (1) this was a

large and complex transaction for Becker; (2) Becker was comparatively inexperienced in this

type of transaction; and (3) unlike Century, there is no agreement content or negotiation history that suggests it should have been especially alert to the possibility of sale of Red Lion by Hilton. Still, while this *might* mean, although the Court does not decide, that Becker could be said to have reasonably relied of an alleged material false statement of the type made to Century, it does not imply that Becker reasonably relied on the statements made to its representatives.  As discussed, *supra*, the Court finds that Becker has not satisfied the material false representation prong for a fraud claim at the summary judgment stage.  Even if the representation Becker alleges was made to it was material and false, it still would not be one on which Becker could have reasonably relied.  Becker complains of having been told that Hilton was going to grow and "promote" the Red Lion brand.  Surely, even an unsophisticated buyer would recognize that this could not be the kind of language on which it could reasonably rely for any purpose.

In sum, no reasonable factfinder could deem Plaintiff Century to have reasonably relied on the alleged false material statements made to it.  Further, no reasonable factfinder could deem Plaintiff Becker to have reasonably relied on the particular alleged false material statement made to it.

### 5.  Damages

Finally, the fourth element of a common law fraud claim requires a showing that Plaintiffs were damaged by the alleged fraudulent statements.  *See Abernathy-Thomas*, 103 F. Supp. 2d at 595.   Plaintiffs allege that Defendants' sale of the Red Lion hotels caused millions of dollars of losses and forced Plaintiffs to sell their hotels.  (Pls.' 56.1 (additional facts) ¶ 41.) As Defendants have not contested that there is a triable issue of fact as to Plaintiffs' damages allegations, these allegations would be sufficient to survive summary judgment on this issue.

6. Fraud: Summary

Plaintiff Century has shown a triable material issue of fact with respect to alleged material false representations made to it. It has failed, however, to show triable issues of fact with regard to Defendants' alleged fraudulent intent or with regard to the reasonableness of its reliance on the alleged statements. Plaintiff Becker has failed to show triable issues of fact with regard to alleged material false representations made to it, with regard to Defendants' alleged fraudulent intent in such statements, and with regard to the reasonableness of its reliance on the statements alleged. Accordingly, summary judgment is granted to Defendants on the fraud count alleged by both Plaintiffs.

C. Negligent Misrepresentation

Plaintiffs' second cause of action alleges negligent misrepresentation. "Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000). However, such misstatements are "actionable only if the defendant is 'under a duty to the plaintiff to exercise reasonable care in giving the information, and plaintiffs' reliance upon the information [is] foreseeable.'" *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (quoting *Heard v. City of New York*, 623 N.E.2d 541, 545 (N.Y. 1993)) (alteration in original). Liability for negligent misrepresentations is "imposed only

41

on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Eternity Global Master Fund*, 375 F.3d at 187 (quoting *Kimmell v. Schaefer*, 675 N.E.2d 450 (N.Y. 1996).

Defendants argue that no special relationship exists between the Parties in this case. Typically, there is no special relationship between the parties to an arms-length transaction. *See Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 536 (S.D.N.Y. 2001) ("[T]he parties must enjoy a relationship of trust and reliance closer than that of the ordinary buyer and seller, and an arm's length business relationship is not enough to create that relationship." (quoting *Goodman Mfg. Co. v. Raytheon Co.*, No. 98-CV-2774, 1999 WL 681382, at *14 (S.D.N.Y. Aug. 31, 1999) (internal quotation omitted))). Thus, a special relationship "must spring from circumstances extraneous to, and not constituting elements of, the contract." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 194 (N.Y. 1987). As noted by Judge Scheindlin when ruling on the Motion to Dismiss, however, one such circumstance is where, "defendants sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information." *Century Pac. I*, 2004 WL 868211, at *8 (internal citation omitted).

Here, at least on the broad theory of the case alleged by Plaintiffs, it would be a triable issue of fact whether a special relationship was created between Defendants and each Plaintiff. Such inquiry is unnecessary, however, because each Plaintiff fails to raise a triable issue of fact with respect to other elements of the claim. As discussed, *supra*, Century has failed to raise a triable issue of fact as to the reasonableness of its reliance on an alleged false representation

made by any of Defendants. *See Hydro Investors*, 227 F.3d at 21. Also as discussed, *supra*, Becker has failed to raise a triable issue of fact as to a false representation having been made to it that the maker should have known was incorrect.

Accordingly, summary judgment is granted to Defendants on the negligent misrepresentation count alleged by both Plaintiffs.

D.  Fraudulent Omission

"To state a claim for fraudulent concealment a plaintiff must show: (1) that the defendant failed to disclose material information that he had a duty to disclose, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bermuda Container Line Ltd. v. Int'l Longshoremen's Assoc.*, 192 F.3d 250, 258 (2d Cir. 1999) (internal citation and quotation omitted). Defendants contend that they had no duty to disclose the possible sale of Red Lion to their franchisees.

Defendants seek to rely on law from outside this Circuit for the proposition that a franchisor has no duty to disclose corporate restructuring or sales information to franchisees. *See, e.g.*, *Williams v. Dresser Indus.*, 120 F.3d 1163, 1170 (11th Cir. 1997) (applying Georgia law). The cases on which Defendants rely, however, do not apply the law of New York – the only relevant law here. Under New York law, a duty to disclose information during a business transaction arises in three situations:  (1) where a party "has made a partial or ambiguous statement," as a party "cannot give only half of the truth;" (2) where a party has a fiduciary duty to another; or (3) where a party has superior knowledge that is not available to the other party and the party with superior knowledge knows that the other party is acting on the basis of

43

mistaken knowledge. *See Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). Plaintiffs allege that the first and third situations are applicable here.

The analysis largely tracks those of the previous two claims. Without deciding the question, the Court may assume here that Century has produced sufficient evidence to raise a triable issue of fact as to whether Defendants made a "partial or ambiguous statement" giving rise to a duty to disclose. *See Creative Waste Mgmt., Inc. v. Capitol Envt'l Servs., Inc.*, 429 F. Supp. 2d 582, 598-99 (S.D.N.Y. 2006) (applying New York law and denying summary judgment where parties contested whether full information over fact relevant to the contract was provided). The Court finds, however, that no reasonable finder of fact could reach such a conclusion with regard to what Becker alleges Defendants' representatives said to it. Plaintiffs' claim under the third prong, for superior knowledge, is legally sufficient in theory. *See Century Pac. I*, 2004 WL 868211, at *9. Yet, again, the Court finds that there is not sufficient evidence for a reasonable finder of fact to conclude that Defendants had a hidden master plan to induce these Plaintiffs into franchise agreements and then sell the brand. To the extent that Plaintiffs' theory rests on reasoning that the Red Lion representatives – and, for that matter, all Defendants' executives and thus the corporate entities – should have seen the sale of the brand as inevitable under the circumstances, Plaintiffs' argument still fails. Such circumstances, to the extent they really could have been said to indicate inevitability of sale, were discernible based on public information equally available to a prospective franchisee in the course of reasonable diligence as to someone inside the company (e.g., the standalone nature of Red Lion's business, the trajectory of Red Lion and other Hilton brand properties). Thus, there is not enough evidence for a reasonable finder of fact to find that Defendants had superior knowledge not available to

Plaintiffs and knowledge that the Plaintiffs were acting on the basis of mistaken knowledge.

Although Century has raised a triable issue of fact as to a false or ambiguous statement, Century cannot be said to have reasonably relied on such a statement. The undisputed facts of Century's negotiation, the contents of its customized Agreement, and its relative sophistication as a party shows that Century should have understood exactly what legal assurances it was being given (and not given) and on what elements of the business deal it was knowingly assuming a risk. For the same reasons above, such analysis might look different for Becker, but Becker has not raised a triable issue of partial or ambiguous statement as has Century.

In sum, each Plaintiff has failed to raise a triable issue of fact with respect to at least one element of the claim. Century has failed to raise a triable issue of fact with respect to its reasonable reliance. Becker has failed to raise a triable issue of fact with respect to circumstances giving rise to a duty to disclose. Accordingly, summary judgment is granted to Defendants on the negligent misrepresentation count alleged by both Plaintiffs.

E.  Breach of Contract

Plaintiffs allege an additional cause of action against Red Lion for breach of contract, which Plaintiffs originally styled as a "Reply Counterclaim." Plaintiffs allege that Red Lion breached the Franchise Agreement entered into with each Plaintiff – specifically, the provisions relating to advertising services and the reservation system, as well as the implied covenant of good faith and fair dealing – by failing to provide comparable "national advertising and marketing programs" and a "global reservations system" following its sale to WestCoast. (Pls.' Reply to Defs.' Countercl. and Countercls. of Pls. (Counterclaims) at ¶¶ 19-28 ("Pls.' Addt'l Claims").) Defendants contend that Red Lion complied with all contractual obligations in

45

regards to the reservation systems.

"Where the language of a contract is unambiguous, the question of interpretation is one of law, and summary judgment may be granted." *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1191 (S.D.N.Y. 1996). "In such cases, the intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible." *Id.* (internal quotations omitted). Where a contract is ambiguous, a court may still construe it, if doing so is possible without reference to extrinsic evidence or circumstances. *See Brass,* 987 F.2d at 148. Where the resolution of the ambiguities depends on outside evidence, however, summary judgment is not appropriate, as the issue is one for a fact finder. *Id.* at 149. "Ambiguous language is that which is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (internal quotation omitted). However, "[s]training a contract's language beyond its reasonable and ordinary meaning does not create an ambiguity. Nor may an ambiguity be found where the contract has a definite meaning, and where no reasonable basis exists for a difference of opinion about that meaning." *Id.* (citations omitted).

Plaintiffs acknowledge that the Agreements "do not specify the extent or type of advertising that is required, nor do they describe in detail the reservations service that must be provided."[14] (Pls.' Mem. 27.) However, Plaintiffs seek to have the Court look to the

---

[14] The Agreements state the following about the reservation services and marketing:

"Reservation services. During the term of this Agreement, [Red

understanding and expectations of the parties in order to determine the terms of the marketing

and reservation portions of the Franchise Agreements. Plaintiffs urge the Court to look beyond

what the Agreements state, as "the Agreements do not specify the extent or type of advertising

that is required, nor do they describe in detail the reservations service that must be provided."

(*Id.*)

      While the Agreements do not include specific details regarding the marketing and

reservation programs to be provided, they are not ambiguous. The Agreements clearly specify

that Red Lion would have "the sole right to determine" how money paid to Red Lion for these

—————————————————

      Lion] will, directly or indirectly, furnish [Franchisee] with the Reservation Service (as defined . . . below). This service will be furnished to you on the same basis as is furnished to other [Red Lion] hotels, subject to the provisions . . . below." (Ex. 45 at 2.)

      "Arrangements for Marketing, Etc.: Periodically, [Red Lion] or one of [its present or future owners, subsidiaries, and affiliated entities] will publish and make available to the traveling public a directory of [Red Lion] hotels, including the Hotel [owned by Franchisee]. Additionally [Red Lion] will include the Hotel, or cause the Hotel to be included in (i) national or regional group advertising of [Red Lion] hotels, and (ii) international, national and regional market programs offered by us . . . ." (Ex. 45 at 2.)

      "We will use your Monthly Program Fee . . . to pay for various programs to benefit the System, including (i) advertising, promotion, publicity, public relations, market research, and other marketing programs . . . We will have the sole right to determine how we spend these funds, including sole control over the . . . placement and allocation of advertising. . . . We will have no obligation . . . to make expenditures for you which are equivalent or proportionate to your payments . . . ." (Ex. 45 at 3.)

services would be used.  (Friedman Aff. Ex. 45 at 3; Friedman Aff. Ex. 46 at 3.)  The

Agreements also state unambiguously that, upon transfer, Plaintiffs' right to use any provided

reservation service may terminate.  (Friedman Aff. Ex. 45 at 11; Friedman Aff. Ex. 46 at 11.)

Thus, this case is different from *Proteus Books Ltd. v. Cherry Lane Music Co.*, in which the

Second Circuit held that whether defendant had met its obligations under a contract that called

for "due professional skill and competence" was a question for the jury.  873 F.2d 502, 507-09,

515 (2d Cir. 1989).  The *Proteus* court noted that the standard was readily discernible because it

was made in reference to the particular relevant industries.  *Id.*  Here, the Agreement includes no

such standards.  Plaintiffs' argument that "both parties, on entering the Agreements, reasonably

expected that the reservations and advertising services would be a certain scope and caliber"

(Pls.' Mem. 27) is unpersuasive, because the "best evidence of what parties to a written

agreement intend is what they say in their writing," *Slamow v. Del Col*, 594 N.E.2d 918, 919

(N.Y. 1992), *quoted in Seabury Contr. Corp. v. Jeffrey Chain Corp.,* 289 F.3d 63, 68 (2d Cir.

2002).  Under New York law, the meaning of an unambiguous provision is exclusively to be

"gleaned from the face of the instrument."  *Chimart Assocs. v. Paul*, 489 N.E.2d 231, 233 (N.Y.

1986) (internal quotation omitted).  Therefore, "[p]arties to a contract may not create an

ambiguity merely by urging conflicting interpretations of their agreement."  *Sayers v. Rochester

Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).  Here, the contract

explicitly gave Red Lion the "sole right to determine how [it] spend[s] [the marketing] funds.

(Friedman Aff. Ex. 45 at 3.)  It explicitly cautioned that transfer of ownership was permitted and

that the franchisees' "right to us any programs, rights or services related to or provided by

[present or future owners, subsidiaries, and affiliated entities of Red Lion], including the

Reservation Service, any guest frequency program not unique to [Red Lion], and any Marks, may terminate." (*Id.* at 11.) There is no ambiguity in these contract terms that would allow admission of parole evidence.

Plaintiffs' argument that Defendants breached the covenant of good faith also fails. "Under New York law, the implied covenant of good faith and fair dealing inheres in every contract." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994); *see also Dalton v. Educ. Testing Servs.*, 663 N.E. 2d 289 (N.Y. 1995) ("Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance."). This covenant of good faith applies even to provisions of a contract that confer decision-making power on a single party. *See Travellers Int'l*, 41 F.3d at 1575. Further, as Plaintiffs point out, "even in a discretionary promotional contract, the obligation of good faith remains, and the particular duties of each party are 'derived both from the common expectations of [the] parties . . . and from the relationship of those parties as structured by the contract.'" *Id.* (quoting *Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671, 679 (2d Cir.1983) (alteration in original)). Still, "[i]t is well-settled that, in construing discretionary promotional contracts, courts will not read into them a 'best efforts' or 'promote fully' clause unless the parties have explicitly bargained for such an obligation." *Travellers Int'l*, 41 F.3d at 1575.

Plaintiffs did not negotiate for a guarantee of "world-class" reservation and marketing services, nor did they negotiate for Hilton's reservation services. They negotiated for the reservation and marketing services provided by Red Lion. The reservation services and marketing sections of each Franchise Agreement discuss only Red Lion services. (Friedman Aff. Ex. 45 at 2-3; Friedman Aff. Ex. 46 at 2-3.) The transfer sections of the contracts specifically

49

state that "this Agreement is for the Licensed Brand only, and the programs that are unique to the Licensed Brand." (Friedman Aff. Ex. 45 at 11; Friedman Aff. Ex. 46 at 11.) Further, Plaintiffs did not negotiate for a provision allowing them to require service of a certain level.

Because the language of the Agreements is unambiguous, and because there is no evidence that the reservation services provided to Plaintiffs after the transfer of Red Lion violated the language of the Agreements, summary judgment for Defendants on the breach of contract claim is granted.

## IV.  Conclusion

Defendants' Motion to Strike Plaintiffs' Exhibits is GRANTED IN PART and DENIED IN PART.  Defendants' Motion for Summary Judgment is GRANTED in its entirety.  The Clerk of the Court is directed to terminate the pending motions on the docket (Nos. 44, 58) but to retain the case as open for disposition of Defendants' counterclaims.

SO ORDERED.

Dated:        October 16 , 2007
              White Plains, New York

                                          KENNETH M. KARAS
                                          UNITED STATES DISTRICT JUDGE

Service List:

Dwight J. Davis, Esq.
Courtland Reichman, Esq.
King & Spalding, LLP
1180 Peachtree Street, NE
Atlanta, GA  30309

Jonathan Solish, Esq.
Glenn J. Plattner, Esq.
Bryan Cave, LLP
120 Broadway, Suite 300
Santa Monica, CA  90401

Lee W. Stremba, Esq.
Troutman Sanders, LLP
405 Lexington Avenue
New York, NY  10174